ALICE BLOOM, Appellant, v. THE SIOUX CITY TRACTION
COMPANY, Appellee.

**Appeal:** NOTICE: SUFFICIENCY. A notice of appeal addressed to the
appellee and his attorneys, service of which is accepted in writing by the clerk of court, when filed in his office is sufficient, even though the notice is not addressed to the clerk.

**Street railways:** INJURY TO PASSENGER: NEGLIGENCE: EVIDENCE. In
this action for injury to a passenger leaving a street car, who passed around the rear of the car, stumbled and fell upon a parallel track and was struck by a car coming from the opposite direction, the evidence is reviewed and it is held that the questions of whether the car, in view of the situation, was being operated at a dangerous rate of speed, and whether had it been operated at a reasonably safe rate of speed the injury would have been averted, were for the jury.

**Same:** CONTRIBUTORY NEGLIGENCE. The evidence is also reviewed and
held to present a question for the jury as to plaintiff's contributory negligence.

**Evidence:** REVIEW OF RULING: MOOT QUESTION. Where a witness
affirmatively shows his incompetency to testify on a subject, a review on appeal of the ruling rejecting his evidence presents only a moot question, and the ruling of the trial court for this reason will be sustained.

*Appeal from Woodbury District Court.*—HON. J. F.
OLIVER, Judge.

THURSDAY, JUNE 16, 1910.

ACTION for damages resulted in a directed verdict for defendant, and judgment thereon. The plaintiff appeals. On rehearing. *Reversed.*

*A. Van Wagenen,* for appellant.

*J. L. Kennedy,* for appellee.

LADD, J.—I. The notice of appeal was not ad-
dressed to the clerk of the district court, though as such
officer he accepted service in writing thereon, and the

1. APPEAL:
notice:
sufficiency.

notice was filed with him on the same
day. Because of the omission of· the ad-
dress, the defendant moves that the ap-
peal be dismissed. Had the address of defendant and
its attorneys been omitted, the notice must have been
treated as insufficient. *In re Estate of Anderson,* 125
Iowa, 670. Service of notice on the adverse party is
exacted for the obvious purpose of informing him that
an appeal has been taken in order that he may prepare
to meet any objections urged against proceedings in the
trial court, but the clerk is neither· a party, nor inter-
ested, and the design of notifying him is not for his benefit
or to enable him to perform some duty, but merely to
advise him of the transfer of the cause to the appellate
court and to supply his files with evidence of the notice
given. Upon filing it with the clerk as exacted by section
4115 of the Code it becomes a part of the records in
the case. *Brier v. Ry.,* 66 Iowa, 602. Under a statute
similar to that of this state, the Supreme Court of Minne-
sota held it unnecessary that the clerk be addressed in the
notice (*Baberick v. Magner,* 9 Minn. 232, Gil. 217),
and later, that the filing in the clerk's office of the notice
of appeal with acknowledgment of service by the attorneys
of the adverse party indorsed thereon was a compliance
with the statute exacting service of such notice on the
clerk of the trial court (*State v. Klitzke,* 46 Minn. 343,
49 N. W. 54). In *McManus v. Swift,* 76 Iowa, 576,
it seems to have been thought the mere filing insufficient,
though acknowledgment of service by a deputy clerk has
been regarded as a compliance with the statute liberally
construed in *Sanxey v. Iowa City Glass Co.,* 68 Iowa,

542.   See *Wheeler & Wilson Mfg. Co. v. Sterrett,* 94
Iowa, 158; *Cullison v. Lindsay,* 108 Iowa, 126.   Pos-
sibly it would be going too far to say the mere filing
of the notice in the office of the clerk constitutes service
on him though no reason appears for requiring more than
the filing, and, this being so, there is no ground for
holding that the form of the notice should be other than
appropriate to advise the adverse party fully and for
filing with the papers in the case.   No purpose whatever
would be served by the insertion of the clerk's name as
addressee, and it would seem out of place in that relation.
It. is enough to serve him with notice addressed to the
adverse party.   The motion to dismiss the appeal is over-
ruled.

II.   One of the defendant's street car lines extends
from the business portion of Sioux City to a suburb
known as "Morningside."   The plaintiff had taken an
outgoing car shortly after eleven o'clock in
forenoon of April 1, 1908, and when the
switch beyond Peter Street was reached it
went on a side track behind a car standing

2. STREET RAIL-
   WAYS: injury
   to passenger:
   negligence:
   evidence.

thereon which had been crippled, and stopped for another
car moving in the opposite direction.   The side track was
about three hundred feet long, and with the main line
ran a little east of a southerly direction.   The day was
clear, the temperature twenty-three degrees above zero,
and the wind blowing from the northwest at a velocity
of forty-six miles an hour.   The plaintiff resided a short
distance south of the next street, and when the car
stopped got off and walked as she testified five or six
feet, or, as testified by the conductor, ten or fifteen feet
back from the rear end of the car, turned to go across
the track, when she stumbled on the second rail and fell,
striking the left side of her head on the nearest rail of
the other track on which a car was then approaching on
its way toward the business center.   The fender of this

car struck plaintiff's forehead throwing her body parallel
with track and causing serious injuries.  The negligence
charged is that the motorman in operating the passing
car, instead of slowing it so as to be under perfect control
before reaching the rear end of the standing car as it
is said in the exercise of ordinary care he should have
done, moved it at a high and dangerous speed, and there-
by was guilty of negligence causing the injuries com-
plained of.  The trial court in directing a verdict for
defendant either held that the evidence was insufficient
to carry this issue to the jury, or that the evidence
adduced was conclusive as to contributory negligence on
the part of plaintiff.  In reviewing this ruling, it will
be necessary to set out the evidence somewhat in detail.
The conductor of the car from which plaintiff alighted
testified:

> The lady passed, I should judge, about ten or fifteen
> feet more or less to the rear of my car.  It might have
> been as little as eight feet. . . .  When she had fallen
> I do not think the car which struck her had got to
> my vestibule yet.  I saw it strike her.  The left corner
> of the fender struck her in the forehead.  The two cars
> were about five or six feet apart when they stopped.  When
> we picked her up, she was about ten or fifteen feet to
> the rear of my car; she had not been moved from the
> place where she fell.  She was simply turned around in
> about the same place where she fell.  She was not drag-
> ged any. . . .  When she fell I was in the north-
> west corner of the vestibule.  After she had fallen, I
> glanced around, and the coming car was not quite to
> the vestibule I was on.  In regard to how far the moving
> car was back or south of the southeast corner of my car,
> I don't know whether those vestibules are seven or eight
> feet long.  It was the distance of the vestibule, what-
> ever that was.

On cross-examination, the witness said that plaintiff
had informed him that she desired to get off at Davis
Street (next south of where the car was stopped); that

when she was about to leave the car he warned her to "Look out"; that as soon as she stumbled he started to her assistance; that he got a sweeping glance of the coming car when she fell and saw it coming down close to the rear platform; that as soon as she fell he made an effort to get down and pick her up:

That the other car was right there in a second or so. It was so quick, I could not determine the time. The other car got there before I could. I am a fairly active man. The ground was rough between the rails. At the time her head struck, I had not had time to get off on the ground. I had to face west to get off. I was in the act of getting off when her head struck. . . . It was so quick it is hard to determine, but I saw her fall and saw her head strike. I started to get off the minute I saw her fall, but, before I could get to the ground, she had struck. As I was getting off, I got a sweeping glance of the other car right at my vestibule. As the other car was coming as I started down I got a glimpse of the other car, just as quick as I could turn my head, and my eyesight followed her as much as possible and it was about the time she struck. When I pulled in on the switch, I saw this car coming about one hundred and fifty feet away. My car had been stopped an appreciable length of time.

On redirect examination, he reiterated his statement that the car was not quite to the vestibule when she fell.

A passenger on the passing car testified that he was standing in the vestibule at the left of the motorman, saw the other car pull in on the side track behind the crippled car, that the motorman on the passing car threw the power off about the length of a car and a half before he reached the switch, and threw it on as he was crossing, and, just before reaching the head of the other car, slowed up by applying the air a little, and then released it, and the car increased in speed, moving downgrade; that, when the vestibule of the car on which he was riding was about the middle of the rear car or past,

he saw plaintiff "plunge head foremost into sight. I
could see the upper part of her body as she fell down.
She fell below my sight. I was standing back in the
vestibule and could not see where she hit the ground.
. . . I think the car was running at a higher rate
of speed before than after he put on the brake but had
not time to attain a high rate of speed afterwards."

On cross-examination:

I was standing against the front door of the car proper.
I would be five feet from the glass windows in the
front of the vestibule or about that. . . . I would
not be positive where the front end of the car was when
I first saw the woman, but it was about the middle or
past the middle of the car she got off of. . . . I was
looking ahead, and not paying much attention to the
car. . . . When the motorman saw her he reached
for the lever. I am not sure that he did not have his
hand on it. He did not apply the air instantly. That
would be impossible. He applied it as quick as he could.
She fell out of my sight, and, at the speed we were go-
ing, I should judge she struck the ground about the time
the fender reached her.

It was stipulated that the cars were forty feet in
length, and it was proven that in passing a standing car
it was the practice of defendant to slow the moving car
so as to be under perfect control before reaching the rear
end of the standing car, to a speed about such as a
man walks. It also appeared that plaintiff in passing
behind the car had this custom in mind; that people
living nearby, including plaintiff, frequently left the car
at this place, though not a crossing, walking therefrom
to their respective homes. No fault is found with the
motorman for not stopping the car promptly after he
discovered the peril of plaintiff. The contention is that
because of the cars on the side track, and the cus-
tom of the company in slowing up and of passengers
to alight here, the motorman was operating the passing

car at a dangerous speed. The evidence was such as
to carry this issue to the jury. True, there was no
opinion evidence of the rate of speed per hour the
car was moving but the testimony of both conductor and
passenger plainly shows that it was moving very fast.
According to the conductor, plaintiff was ten or fifteen
feet back of the rear end of the car when she stumbled,
and, though he was an active man and started for her
rescue immediately, he had not gotten off when the car
struck her, having moved from seventeen to twenty-three
feet in the meantime. The passenger saw her falling as
the end of the passing car was opposite to or a little
past the middle of the standing car or some fifteen or
twenty feet from its rear end, so that if plaintiff was
ten or fifteen feet beyond she must have been from twenty-
five to thirty-five feet ahead when the motorman first could
have seen her, and yet, according to the passenger, he
had but seen her when she disappeared, and he heard
the report of the collision. Moreover, the car was moving
down-grade, and though the current of electricity was
thrown off about sixty feet before reaching the switch,
it was turned on in passing over, and though a little
air was applied as the car approached the standing car
it was removed at once, so that, when the motorman first
observed plaintiff, the power was on, with the car gliding
rapidly downgrade. The handling of the car as described
but confirms the inference which might be drawn from
the fact that the collision occurred almost immediately
after plaintiff fell, although the car was some distance
away. It is not for the court to say what rate of speed
would be dangerous in passing at this point. As pas-
sengers frequently got off there, defendant was required
to operate its cars with this in mind, and that it cus-
tomarily slowed its cars in passing at that place was a
circumstance tending to show that this was the proper
thing to do. We are of opinion that whether the car,

in view of the situation, was being operated at a dangerous speed was for the jury to determine, as was also whether had it been operated at a reasonably safe speed the injury would have been obviated.

Was plaintiff guilty of contributory negligence? This, too, was an issue for the jury. Owing to the crippled car, that on which she was riding must have backed out on the main line before resuming its journey.

3. SAME: contributory negligence.

It was then about halfway between the streets, and she lived but a short distance beyond the next one. She got off as she and the others had often done and walked to the rear of the car. Had she started across immediately behind the car there would be strong ground for holding this contributory negligence, 'for opportunity to see would have been cut off, and the transmission of sound much obstructed. *Burgess v. Ry.* 17 Utah, 406 (53 Pac. 1013); *McCarthy v. Ry.,* 120 Mich. 400 (79 N. W. 631); 2 Thompson Negligence, section 1461. But she went a considerable distance to the rear, and where, ordinarily, she could see and hear before undertaking to cross. According to her testimony she knew the north-bound car was due, had a faint recollection of having seen it, and had in mind the custom of slowing up in passing. If in this situation she had walked across the space of four or five feet between the tracks and in front of the approaching car, doubtless she must have been regarded as having been negligent. But she had only reached the west edge of the intervening space when she stumbled, and it can not be assumed conclusively that, but for stumbling, she would have walked heedlessly in front of the moving car without observing it. Stumbling was not necessarily negligent, nor can she be said to have been negligent in falling in a dangerous place. The most that can be said is that, if she was intending to cross the track regardless of the passing car, she was intending to do a negligent

act. Such intention, if it existed, was interrupted before she reached the zone of danger and the issue as to whether she was guilty of negligence which contributed to her injury, as said, was for the jury.

Appellant complains of the court's ruling on a tender of evidence of a general custom with reference to slowing cars when passing. It is enough to say with reference to this that the witness by whom it was proposed to prove said custom affirmatively established his incompetency to testify, so that but a moot question was presented, and for this reason the ruling is sustained. It follows from what we have said that the court erred in not submitting the issues to the jury.— *Reversed.*

4. EVIDENCE: review of ruling: moot question.